1
2
3
4
5
6
7
8          UNITED STATES  DISTRICT COURT
9            Northern District of California
10             SAN FRANCISCO DIVISION

11   KATHERINE CORA KING,                    No. C 11-01776  LB

12            Plaintiff,              **ORDER REGARDING CROSS-
                                      MOTIONS FOR SUMMARY
13       v.                           JUDGMENT**

14   MICHAEL ASTRUE, Commissioner of      **[ECF Nos.  23 &  24]**
     Social Security Administration,
15
                  Defendant.
16
     _____/
17

18                    **I. INTRODUCTION**

19      Plaintiff Katherine King moves for summary judgment, seeking judicial review of a final

20   decision by Defendant Michael Astrue, the Commissioner of Social Security Administration,

21   denying her Social Security Income disability benefits for her claimed disability of degenerative

22   joint disease of the knees, noninsulin dependent diabetes mellitus, morbid obesity, neuropathy of the

23   feet and uncontrolled depression.  Plaintiff's Motion, ECF No. 23.[1]  The Administrative Law Judge

24   ("ALJ") determined that Ms. King had residual functional capacity ("RFC") to perform a limited

25   amount of light work, and denied Social Security Income ("SSI") disability benefits.  Administrative

26   Record ("AR") at 17-23.

27   _____

28        [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the document.

1   Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

2   without oral argument.  All parties have consented to the court's jurisdiction.  *See* ECF Nos. 23 &

3   24.  For the reasons stated below, the court **DENIES** Ms. King's  motion for summary judgment and

4   **GRANTS**  the Commissioner's cross-motion for summary judgment.

5                                          **II. PROCEDURAL HISTORY**

6   Ms. King, now 67, applied for disability benefits on June 16, 2008.  (AR 15).  In that application

7   she alleged that she had been disabled since June 26, 2007 by a combination of impairments: nerve

8   damage in both feet, arthritis in both knees, and obesity.[2]  (AR 89).  The Commissioner denied her

9   application both initially on August 7, 2008 and upon reconsideration on October 21, 2008.[3]  (AR

10  96).  Ms. King timely requested a hearing before an ALJ on December 17, 2008.  (AR 101).

11  On August 4, 2009, Ms. King filled out a Medical and Vocational Statement.  (AR 191).  In

12  response to the question as to whether there had been any change in her medical state, Ms. King

13  indicated on the form that her medical issues with her feet had significantly worsened, but made no

14  mention of her mental state, which she now contends is at issue.

15  An ALJ conducted a hearing on September 4, 2009, in San Rafael, California.  (AR 29).  Ms.

16  King appeared at the hearing without counsel.  ALJ Price, who presided at the hearing, spent the

17  beginning of the hearing explaining to Ms. King her right to representation at the hearing, and the

18  possible benefits to her of having counsel represent her.  Although ALJ Price explained in detail that

19  she might be better able to present her case with assistance, Ms. King decided to proceed

20  representing herself.  (AR 30-32).

21  On January 28, 2010, the ALJ found that Ms. King was not under a disability at any time from

22  June 26, 2007 through the date of the decision.  (AR 15).  On February 18, 2010, Ms. King filed a

23  request for review of the ALJ's decision.  (AR 11).  At this point Ms. King also retained counsel,

24  Mr. Ian Sammis.  (AR 9).  As part of the appeal process, counsel for Ms. King submitted, and the

25  Appeals Council made part of the record, the following: correspondence from Ms. King dated 7/3/09

26

27      [2] Ms. King has alleged on appeal that she is also disabled due to uncontrolled depression.

28      [3] After the original denial, Ms. King requested reconsideration stating the basis as her feet
having gotten worse.  (AR 95).

1   and 8/15/10 (AR 194); correspondence from her counsel Mr. Sammis dated 9/17/10 (AR 205); a

2   letter from Ms. King's daughter, Karla Cotten, dated 8/17/10 (AR207) regarding statements claimant

3   and her daughter assert were made by the ALJ at the hearing regarding Ms. King's status as "not

4   employable"; and a medical report from the Marin Community Clinics dated 4/14/10 (AR 300).  The

5   Appeals Council denied Ms. King's request for review on March 23, 2011.

6        After Ms. King's claim was denied by the Appeals Council, her attorney died.  On March 23,

7   2011, Ms. King, represented by new counsel, Robert Weems, timely sought judicial review under 42

8   U.S.C. § 405(g).  Complaint, ECF No. 1.  Both sides have now moved for summary judgment.

9   Plaintiff's Motion, ECF No. 23; Defendant's Opposition and Motion, ECF No. 24.

10                              **III.  LEGAL STANDARD**

11   **A.  <u>Standard of Review</u>**

12        Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

13   Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

14   aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

15   are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

16   *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

17   than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

18   might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

19   1995).  If the evidence in the administrative record supports both the ALJ's decision and a different

20   outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See*

21   *id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

22   **B.  <u>Applicable Law: Five Steps To Determine Disability</u>**

23        An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

24   or mental impairment which can be expected to result in death or which has lasted or can be

25   expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

26   impairments are of such severity that he is not only unable to do his previous work but cannot,

27   considering his age, education, and work experience, engage in any other kind of substantial gainful

28   work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

ORDER (C11-01380 LB)

3

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(I).

**Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.**  Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.**  Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

### IV. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) Ms. King's testimony, and (c) the ALJ's findings.

### A. Medical Evidence

Ms. King, now 67, alleges that she had been disabled since June 26, 2007 by a combination of impairments: nerve damage in both feet, arthritis in both knees, and obesity.  Additionally, she suffers from uncontrolled depression.

///

UNITED STATES DISTRICT COURT
For the Northern District of California

**1**. **Dr. Susan Martling: Treating Physician**

Dr. Martling treated Ms. King in 2007.  She ordered a radiology report on Ms. King's right knee. (AR 218).  The report noted moderate degenerative osteoarthritis.  Dr. Martling then saw Ms. King on September 24, 2007. (AR 213).  She notes that Ms. King is morbidly obese, has right knee osteoarthritis and neuropathy in her feet.  The medical plan states Ms. King should continue weight loss and take ibuprofen.

**2. Dr. Schaaf: Treating Physician**

Dr. Schaaf appears to have taken over for Dr. Martling, and she was Ms. King's treating physician from September 2007 through 2010.  Dr. Schaaf met with Ms. King frequently throughout this period.

Dr. Schaaf saw Ms. King on September 25, 2007.  (AR 212).  Her notes indicate that Ms. King suffered from obesity, right knee arthritis, and a foot impairment which was difficult to specify.  Ms. King did not complain of pain but she reported to Dr. Schaaf that for ten years she had bilateral foot stiffness, cracking and unsteadiness.  As a result, Dr. Schaaf referred Ms. King to a physical therapist, and to the YMCA.  It also appears that Dr. Schaaf gave Ms. King something so that she could get a 6-month disabled sticker for her car.  (AR 212).

Dr. Schaaf met with Ms. King on October 9, 2007.  (AR 211).  Dr. Schaaf and Ms. King went over some lab results.  Ms. King reported that her foot discomfort and imbalance continued.  They discussed diet and exercise for Ms. King including walking and going to the YMCA and s having Ms. King take some B12 vitamins.

Ms. King met with Dr. Schaaf again on October 30, 2007.  (AR 210).  At this time Dr. Schaaf noted that Ms. King complained that her feet felt like she had a "piece of cardboard under her skin" which made her feel unsure of herself on her feet.  (AR 210).  There does not appear to be any treatment associated with this visit except for the scheduling of a return visit in 2-3 months.

Ms. King returned to see Dr. Schaaf on February 26, 2008.  (AR 253).  The notes indicate that Ms. King had applied for disability benefits.  Ms. King had stopped taking pain medications as she reported they were not helping.  Dr. Schaaf prescribed lidocaine patches and sent Ms. King to Dr. Schten for a knee injection.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On March 20, 2008, Dr. Schaaf met with Ms. King. (AR 250).   Ms. King reported that she was

2    "walking funny" because of her right knee but that it was not painful and the steroid injection had

3    helped "99%."  She did report pain in her left knee.  Dr. Schaaf referred Ms. King for x-rays and an

4    injection in her left knee.

5    Dr. Schaaf saw Ms. King on April 1, 2008 and noted that she was "doing ok."  (AR 249).

6    On May 1, 2008, Dr. Schaaf saw Ms. King.  (AR 244).  Ms. King had lost weight, but was still

7    concerned about the "crackling" feeling she was having under her feet.  Ms. King had just had x-

8    rays taken of her feet to attempt to ascertain the cause of her issues. (AR 245)  The x-rays revealed

9    no abnormalities or significant arthritic changes in Ms. King's feet, but did note "significant

10   degenerative arthritis in her left knee joint.  (AR 246).  Dr. Schaaf referred Ms. King back to Dr.

11   Schten for further steroid injections.  (AR 244).

12   Dr. Schaaf saw Ms. King on June 19, 2008. (AR 241).  At that time Ms. King reported that the

13   steroid injection had helped her knee but that she was still suffering from foot discomfort and that

14   she was going to see a disability doctor and apply for disability.

15   When Ms. King met with Dr. Schaaf on September 23, 2008, Ms. King reported that she was

16   having, as the doctor's notes indicate, "lots [of] bad problems": her application for disability had

17   been turned down, her dogs had died, and her daughter was less able to assist her as she had taken a

18   full time job. (AR 239). Dr. Schaaf's notes indicate that her evaluation is that Ms. King's mental

19   state is negative for suicidality.  As to her physical condition, she continued to have foot discomfort

20   without pain but with some unsteadiness.  Ms. King indicated that she did not wish to continue on

21   her cholesterol medications and that she would work hard on her diet.  The doctor prescribed B12,

22   lab tests and exercise on a stationary bicycle and also at the YMCA.  There does not appear to be

23   any treatment plan beyond that to address Ms. King's mental state.

24   Dr. Schaaf saw Ms. King on October 7, 2008.  (AR 238).  In that visit Dr. Schaaf noted that Ms.

25   King had strained her back weeding.  The doctor prescribed ibuprofen and flexeril.  There was no

26   mention in Dr. Schaaf's notes of any discussion or treatment for depression.

27   Ms. King returned to Dr. Schaaf on November 4, 2008.  (AR 288).  There was some discussion

28   about Ms. King having been turned down for disability.  Ms. King reported that she was walking

UNITED STATES DISTRICT COURT
For the Northern District of California

1  with difficulty and that her imbalance felt progressive, but that her right knee had improved after the

2  cortisone shot.  Dr. Schaaf referred Ms. King to a neurologist.

3      On November 18, 2008, Ms. King had an appointment with Dr. Schaaf.  (AR 290).  Ms. King

4  reported heel pain, which Dr. Schaaf indicates is plantar fasciitis.

5      Dr. Schaaf met with Ms. King on September 4, 2009.  (AR 283).  The records note that Ms. King

6  had lost 14-15 pounds.  There is mention that Ms. King has her disability hearing and needs her

7  medical records.  There is no mention of depression or any treatment related to medical state.

8      On April 14, 2010, Dr. Schaaf provided a handwritten letter in support of Ms. King's statements

9  regarding her inability to work.  (AR 300).  In this letter Dr. Schaaf states that Ms. King has "severe

10  bilateral knee arthritis, was poorly responsive to knee injections and anti-inflammatory and pain

11  medications."  The letter further states that Ms. King has a severe S1 radiculopathy that makes

12  walking "difficult and causes pain."  Dr. Schaaf notes that Ms. King is undergoing treatment for

13  uncontrolled depression, obesity and increased glucose.  Finally, Dr. Shaaf opines that given these

14  "current issues" she does not feel that Ms. King is capable of employment.

15  **3.  Dr. Erik Schten:  Treating Physician**

16      Dr. Schten saw Ms. King on March 10, 2008, May 22, 2008, November 3, 2008, and January 29,

17  2009.  (AR 242, 251, 285, 289).  At the March 10, 2008 visit Dr. Schten noted that Ms. King had a

18  history of osteoarthritis in the knee, that she was in pain, and that while Motrin had helped her

19  previously, it was not helpful then.  (AR 242).  He also noted that Ms. King was having trouble

20  sleeping and doing exercise.  His report stated that her right knee showed tenderness no instability,

21  erythema, or effusions.  The treatment plan indicates an injection and also that Ms. King should take

22  Tylenol or Advil, seek an evaluation for knee replacement surgery, and do exercises to strengthen

23  her knee and to lose weight.

24      On May 22, 2008, Dr. Schten saw Ms. King again.  (AR 251).  He noted that Ms. King had

25  osteoarthritis of the knee and diabetes, which he referred to as "under good control."  Dr. Schten

26  also noted that Ms. King had been losing weight and exercising and that she would like to avoid

27  knee surgery.  At that visit Dr. Schten gave Ms. King a steroid injection in her left knee.

28      Dr. Schten saw Ms. King on November 3, 2008.  (AR 289).  He noted that she was having

worsening knee pain but was getting good relief from the steroid injections. Her left knee was "still doing well from her steroid injection in June." Ms. King received a steroid injection in her right knee at that visit. While Dr. Schten notes no other physical issues, his notes state that Ms. King is "very distraught, she has been turned on [sic] for disability." There is no mention however of any further discussion, treatment or follow-up related to her mental state. (AR 289).

On January 29, 2009, Ms. King returned to Dr. Schten for further knee injections. AR 285. He noted that she was getting about two to three months of relief from her knee pain with the injections. He stated that she had been taking Motrin for pain relief but did not like taking medications and that in the past acupuncture had been successful for her. His physical examination noted no erythema or effusions. Dr. Schten opined that Ms. King was not enthusiastic about the idea of knee surgery and that she would attempt to lose weight, undergo acupuncture, and take Tylenol. There is no further mention regarding Ms. King's mental state.

**4**. **Dr. Jonathan Katz: Treating Physician**

Dr. Schaaf referred Ms. King to Dr. Jonathan Katz, the Director of the Neuromuscular Program at California Pacific Medical Center. Dr. Katz treated Ms. King in December 2008 and February 2009. (AR 275, 277-81). Ms. King reported to Dr. Katz that she had "an unusual sensation on the bottom of her feet" which was not numbness or pain but more of a "crackling feeling." (AR 275). She reported that she had been experiencing that feeling for about ten years. She did not report foot pain. The doctor noted no other problems in the tops of her feet or up her leg. The doctor found the case "difficult" and thought it was possible that she was suffering from "mild S1 radiculopathies." (AR 276). He thought that a nerve conduction study might lead to a more conclusive diagnosis and also might end Ms. King's need to speculate on a diagnosis.

Ms. King underwent the nerve conduction study on January 13, 2009 (AR 278) and then met with Dr. Katz on February 3, 2009 for a follow up appointment. (AR 277). His notes for the February 3, 2009 visit indicate a diagnosis of chronic bilateral S1 radiculopathy. He states that at that visit he and Ms. King "had a very long discussion about . . . why losing weight" was probably the best way to treat her condition. Dr. Katz noted that Ms. King had lost 18 pounds over the month prior to the visit by dieting more effectively. He requested to see her back in a month with the idea

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   that he would "refer her to more sophisticated weight control if we hit any snags."

2   **5. Dr. B. Sheehy: SSA Medical Consultant**

3   Dr. Sheehy conducted a Physical Residual Functional Capacity Assessment on August 6, 2008.

4   (AR 219-24). This report indicates that there are no treating or examining source statements

5   regarding the claimant's physical capacities in the file (AR 224), but it does appear that there was

6   some treating physician information which served as the basis of the assessment (AR 220).[4] Taking

7   into account Ms. King's neuropathy, Dr. Sheehy noted that the neuropathy pain could be aggravated

8   by long periods of standing and walking. This seems to have influenced the limitations he placed in

9   the assessment on Ms. King's ability to stand, walk, sit, lift and carry. (AR 220).

10   **6. Dr. Antoine G. Dipsia: Social Security Consultative Recommendation**

11   A case analysis was performed on October 28, 2008. (AR 263-64). The memo indicates that it

12   is from D. Tucker. The analysis looks at the issues of nerve damage to Ms. King's feet, arthritis and

13   obesity. Looking at Ms. King's medical records from March through May 2008, the analysis notes

14   that Ms. King had no knee swelling, instability, effusion or erythema. The analysis states that

15   sedentary RFC seems reasonable, but requests "please advise" to which Dr. Dipsia seems to respond

16   "agreed, affirmed, thanks AGD 10/20/08." (AR 264).

17   **B. Ms. King's testimony**

18   Ms. King appeared before an ALJ on September 4, 2009. (AR 29). Ms. King appeared without

19   counsel. ALJ Price, who presided at the hearing, went over with Ms. King her right to

20   representation at the hearing, and the benefits to her of having counsel help her present her case.

21   Although ALJ Price explained that counsel could "represent you by presenting your case in the most

22   favorable possible way," Ms. King decided to proceed representing herself. (AR 30-32).

23   The following is a summary of the facts to which Ms. King testified at that hearing. The ALJ

24   opened the proceedings by reviewing the record with Ms. King to ensure that all relevant evidence

25   was in the record and ascertaining from Ms. King what additional medical information should be in

27   _____

28   [4] The Assessment states the following: "see consult; MER; ADL's clmnt has pain in B feet that TP reports is due to DM peripheral neuropathy," where the court assumes that "TP" refers to "treating physician."

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  it, as the records only went through October 2008.  (AR 33-34).  ALJ Price indicated that he would

2  hold the record open and that both the SSA and Ms. King could work together to get the updated

3  medical records.  (AR 35).  Ms. King stated that her medical records might not reflect the true extent

4  of her limitations as she might not have shared that with the doctors.  ALJ Price told her that the

5  hearing was her opportunity to present all of that information to him.  (AR 37).

6      The ALJ then explained to Ms. King what she would have to prove at the hearing and the role of

7  the vocational expert who was also present at the hearing.  (AR 37-39).  The ALJ reviewed with Ms.

8  King her work history and the physical requirements for her past jobs.  (AR 41-43).  Ms. King

9  testified that she stopped working because she was "having a terrible time with [her] legs and feet"

10  and that "it was extremely hard to get up and down."  (AR 43)

11      The ALJ then went on to explore with Ms. King the parameters of her problems with her legs

12  and feet.  Ms. King testified that she had been having problems with her feet and legs for between

13  fifteen and twenty years, but that for the preceding three to four years her problems had become

14  much worse.  (AR 44).  She explained that she had left her job in June 2007 because it required

15  climbing stairs and she felt very unsteady when she walked.  (AR 44).  She stated that she had fallen

16  a number of times, although she had not been seriously hurt.  (AR 44).

17      When the ALJ explored her medical issues with her she stated that her problem was primarily

18  with her feet, and that while her knees still hurt it was the unsteadiness on her feet which was her

19  main concern.  (AR 45).  Ms. King does not use any assistive devices to increase her steadiness.  She

20  had a walker at one point for about six or seven months, but it broke and she did not replace it.  (AR

21  45-46).  The ALJ questioned Ms. King about whether she had been referred to any specialists or for

22  therapy.  Ms. King stated that she had been referred to a neurologist and that the treatment

23  prescribed had been 800 mg of Motrin.  (AR 47).

24      ALJ King then questioned Ms. King about her knees.  She stated that she had pain in both knees

25  with the right knee being extremely painful, but that the pain had not worsened since she stopped

26  working.  (AR 48).  Ms. King testified that she had gotten about one year of relief from the pain

27  from her first steroid injection in her right knee, but that the third steroid injection had provided her

28  with no relief so she stopped getting them.  (AR 49).

ORDER (C11-01380 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The next topic explored by the ALJ with Ms. King was her physical limitations.  He asked her

2    how far she could walk and she indicated that she could walk around her house as there are things to

3    hold onto, and that she can walk from her car to the store and around the store relying on a shopping

4    cart for balance.  (AR 50).  She shops a few times a week.  (AR 58).  As it relates to her ability to

5    stand, Ms. King stated that the length of time she could stand was related to her balance.  (AR 50).

6         In terms of sitting, Ms. King stated that she sits a lot of the day, but she has to move around

7    some as she gets restless and that at most she could sit fifteen to twenty minutes without getting up.

8    (AR 52).  Ms. King indicated that she could lift something like a gallon of milk from the refrigerator

9    or a ream of paper.  (AR 53).  She also testified that she is able to care for herself in terms of

10   bathing, dressing, and preparing food, but was not able to do the cleaning in her apartment or walk

11   her dogs.  (AR 56).  She stated that she spends much of her time watching television in her recliner.

12   (AR 57-58).

13        The ALJ then opened the questioning up, giving Ms. King an opportunity to discuss any other

14   topic she wished.  (AR 59).  Ms. King explained that the neurologist determined from a nerve

15   conduction study that Ms. King had pinched nerves in her back affecting her feet and that he

16   diagnosed this as radiculopathy.  (AR 60).  While Ms. King started to say that the neurologist had

17   mentioned her weight as a contributing factor, when questioned by the ALJ on this issue, she

18   testified that the doctor did not think her medical issue was related to her weight.[5]  (AR 60).  The

19   ALJ explored with Ms. King her weight and she testified that she hoped she had lost some weight

20   but that she thought she weighed around 298 pounds at the time of the hearing and that this had been

21   her weight even when she was working.  (AR 61).

22        The ALJ gave Ms. King an additional opportunity to present "anything else that [she] felt [he]

23   need[ed] to be aware of or consider."[6]  (AR 61).  Ms. King did not take this opportunity to add any

---

25        [5] In point of fact, Dr. Katz's notes from their visit indicate that he and Ms. King "had a very
26   long discussion about . . .why losing weight" was probably the best way to treat her condition.  (AR
     277).

27        [6] While Ms. King now claims that she suffers from uncontrolled depression, she made no
28   mention of this at the hearing, even though the ALJ gave her two separate opportunities to raise any
     additional issues.  In terms of her demeanor at the hearing, the record notes several occasions where

1   additional information herself but she asked if the ALJ would like any information from her

2   daughter, Karla Cotten, who was with her at the hearing. The ALJ then invited Ms. Cotten to testify.

3   Ms. Cotten testified that she would go to her mother's house a couple of times a week at which time

4   she would do some light cleaning and walk the dogs. (AR 63).

5        The ALJ asked Ms. Cotten if she thought her mother could work and Ms. Cotten opined that her

6   mother could do "a little bit here, and then she has to sit down, and then she could do a little bit,"

7   fifteen minutes at a time. (AR 63).

8   **C.  Vocational Expert Testimony**

9        Vocational Expert Lynda Berkley testified at the hearing. Ms. Berkley first explained her

10  expertise. (AR 66). She stated that she had reviewed Ms. King's file but that she also had a few

11  questions for Ms. King. (AR 67-68). Ms. Berkley proceeded to clarify the tasks Ms. King had

12  performed for her position at the pest control company and the ratio of sitting/standing that this

13  position required. Ms. King confirmed that her position with the pest control company had required

14  about six hours of sitting and one hour of standing each day. (AR 68-69). Ms. Berkley classified

15  this position as "front office worker," a sedentary position. (AR 71).

16       As it related to the cab company position, Ms. King was a part owner of that business, and at

17  times also drove a cab. Ms. Berkley found that the position had three relevant job titles in the

18  Dictionary of Occupational Titles ("DOT"): small business owner (with an exertional level of

19  "light"); taxicab coordinator (with an exertional level of "sedentary"); and then cab driver (with an

20  exertional level of "medium").

21       After Ms. Berkley had made her presentation, ALJ Price posed a hypothetical question to her: if

22  Ms. King's limitations were that she could sit for six hours, stand and walk for two hours, and

23  lift/push and pull occasionally, could she perform light or sedentary work. Ms. Berkley opined that

24  Ms. King could then perform the tasks of taxicab coordinator and front office worker, but not small

25  business owner owing to the amount of standing required for that position. (AR 74). Ms. Berkley

26  also noted that given Ms. King's physical limitations and skill set she could work as a receptionist

27

28

Ms. King laughed, suggesting that she did not outwardly present as despondent.

ORDER (C11-01380 LB)                                    12

UNITED STATES DISTRICT COURT
For the Northern District of California

and noted that there were 20,000 such positions in the Bay Area or as a taxicab starter for which

there were 1,800 positions in the Bay Area.  The ALJ then asked Ms. Berkley to consider Ms.

King's age, education and work experience along with her physical limitations.  (AR 76).  Ms.

Berkley stated the same two jobs would be appropriate for Ms. King, along with unskilled positions

such as food and beverage order clerk or telephone clerk.  Finally, the ALJ asked whether there were

any positions in the economy consistent with Ms. King's limitations which could be performed if an

individual needed to take frequent breaks, The vocational expert answered that there were not.

## D. Evidence Regarding Ms. King's Emotional State

While the paperwork Ms. King submitted to the SSA states that her disability claim was based

on  nerve damage in both feet, arthritis in both knees and obesity, Ms. King has added "uncontrolled

depression" as one of the bases for her claim of disability.

The first discussion in the record about depression is in August 2008 on the Disability

Report-Appeal (Form SSA-3441), where Ms. King stated: "I have not been able to function as a

normal human being.  It is taking a toll on me physically and mentally."  (AR 171).

She further stated:

> I have missed 2 doctors appointments mainly because I have a terrible time getting there
> and because I just don't give a damn!  If this is what the rest of my life is going to be like,
> then I do not want to be around! . . . I am so bored and depressed staying in for 24 hours for
> days and months on end. . . . Life sucks!  (AR 171).

> I try to explain to my kids as I am trying to be brave and don't want my kids to feel sorry
> for me.  Except for my daughter, my sons don't know how bad off I am, plus they're always
> on my case about losing weight which I have given up on that.  I can't walk, I can't lose
> weight, I can't function normally and I do everyday chores.  Does this sound like I am doing
> wonderful and can go back to work?  I am fricken miserable!!! . . . I just don't really care
> about anything anymore.  (AR 175).

Evidence regarding depression from her treating physician consists of Dr. Schaaf's September

22, 2008 notes that Ms. King is upset due to circumstances in her life including being denied for

disability, her dogs dying, and her daughter's relative unavailability.  Dr. Schaaf found Ms. King

"negative for suicidality" and there is no mention of treatment or follow up for her depression.  (AR

239).

On November 3, 2008, Dr. Schten found Ms. King "distraught," but again there is nothing in the

record which indicates follow-up or treatment in this regard.  (AR 289).

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Ms. King's Request for Hearing, dated December 8, 2008, reflects ongoing depression related to

2    her difficulty walking and the lack of a diagnosis regarding her feet ("It is my daily life that has

3    changed to the point where it isn't worth living!!!").  (AR 101).

4        In a later Disability Report-Appeal form Ms. King updates her medical records noting that she

5    had last seen Dr. Schaaf in November of 2009, at which time she says that one of the reasons for her

6    visit was that she was "[b]ecoming very depressed" and that she was prescribed "depression pills"

7    but found that they did not work.  (AR 182).[7]

8    **E.   Administrative Findings**

9        Applying the sequential evaluative process, on January 28, 2010, the ALJ held that Ms. King

10   was not disabled under Section 216(i), 223(d) and 1614(a)(3)(A)of the Social Security Act during

11   the period from her alleged onset of disability date, June 26, 2007 through the date of the decision.

12   (AR 15).  The ALJ found therefore that Ms. King was not entitled to disability insurance benefits.

13   (AR 23).

14       The ALJ first found that the claimant met the insured status requirements of the Social Security

15   Act through May 31, 2011.  (AR 17).

16       At step one, the ALJ found that claimant had not engaged in substantial gainful activity since

17   June 26, 2007, the alleged onset date.  (AR 17).

18       At step two, the ALJ found that claimant had the following severe impairments: degenerative

19   joint disease of the knees, noninsulin dependent diabetes mellitus, morbid obesity, and neuropathy

20   of the feet.

21       At step three, the ALJ found that claimant does not have an impairment or combination of

22   impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404,

23   Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).  The

24   ALJ found in this regard that there was no report of any disturbance of gait or station and that Ms.

25   King's strength and reflexes have consistently been reported as normal.  He further found that

26   claimant's medical condition has been stable with conservative treatment and that there was no

27

28       [7] There does not appear to be any corresponding medical record from Dr. Schaaf's office for
     this visit in the case records.

UNITED STATES DISTRICT COURT
For the Northern District of California

1     indication of any marked or extreme limitations or any need for more aggressive treatment.  (AR

2     18).

3        The ALJ also found that claimant had, and had never lost for any significant period of time, the

4     residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)

5     with the following physical limitations: she could stand and walk at least two hours and sit six hours

6     in an eight-hour workday; she could occasionally push and pull with her lower extremities, never

7     climb or balance, frequently stoop, occasionally crouch, and never crawl; and she needed to avoid

8     hazards such as heights and moving machinery, and avoid walking on uneven terrain.  (AR 18).

9        The ALJ broke this analysis into two steps.  The ALJ first provided a fair summary of Ms.

10    King's testimony and that of her daughter.  The ALJ stated that after careful consideration of the

11    evidence he found that Ms. King's medically determinable impairments could reasonably be

12    expected to cause her alleged symptoms.  However, he found inconsistencies between her testimony

13    and the residual functional capacity assessment and to the extent that there were inconsistencies, he

14    found Ms. King's statements about intensity, persistence, and limiting effects of her symptoms to

15    not be credible.  (AR 19).

16       As it related to her knee pain, the ALJ found evidence in the record which indicated that the

17    steroid injections had been of some benefit to her despite her testimony that they were of no value.[8]

18    (AR 20).  As to her foot discomfort, the ALJ noted that Ms. King's suffering from that symptom was

19    longstanding and had not increased dramatically on or after the alleged onset date of her disability.

20    (AR 20).  The ALJ also noted that Ms. King had in fact been advised that weight loss would

21    alleviate some of her symptoms, which appeared to be the case.  (AR 20).  Finally, the ALJ noted

22    that while Ms. King's primary complaint was her balance, she did not use any assistive device to aid

23    her in balancing.

24       The ALJ concurred with the finding of the state agency medical expert who found that Ms. King

25    could perform a range of light work consistent with the limitations outlined above on walking,

26    sitting, standing, etc.

27    _____

28         [8] Ms. King testified that the first shot had been of great value to her but by the third shot she
      was not seeing a great benefit to the injections.

ORDER (C11-01380 LB)

1    The ALJ rejected any additional limitations based on the limited medical treatment Ms. King

2    was receiving and also because of the number and types of activities she reported being able to

3    engage in. (AR 20).

4    At step four, the ALJ found that Ms. King was capable of performing past relevant work as a taxi

5    cab coordinator and a front office clerk, as these positions would be within her physical limitations.

6    (AR 20).  The ALJ based his decision in part on the testimony at the hearing of the vocational

7    expert.

8    The ALJ also found that there were other jobs existing in the national economy which Ms. King

9    could perform.  Therefore he made an alternative finding for step five.  (AR 21).  The ALJ found

10   that as of the alleged disability onset date Ms. King was a person closely approaching retirement

11   age.  The ALJ then summarized Ms. King's work skills and found that her skills were transferable to

12   other occupations which existed in significant numbers in the national economy.  The next step

13   involved the ALJ considering whether based on Ms. King's age, education, residual functional

14   capacity, and work experience, she could make a successful transition to other work.  (AR 21).  In

15   doing so he consulted the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.

16   Again, the ALJ relied on the testimony of the vocational expert regarding semi-skilled positions Ms.

17   King could perform such as front desk receptionist and taxi starter.  (AR 21).  The ALJ rejected the

18   non-skilled positions identified by the vocational expert due to Ms. King's advanced age.

19   In conclusion, the ALJ held that "although the claimant's additional limitations do not allow the

20   claimant to perform the full range of light work, considering the claimant's age, education, and

21   transferable work skills, an alternative finding of 'not disabled' is appropriate."  *See* Medical

22   Vocational Rules 202.07, 201.07;  §§ 202.00(f) and 201.00(f) of the Medical-Vocational Guidelines;

23   20 CFR 404.1568(d), 416.968(d).

24   Based on all of the above, the ALJ rendered a decision that Ms. King was not disabled under

25   § 1614(a)(3)(A) of the Social Security Act.  (AR 23).[9]

26

27   _____

28   [9] After the decision was rendered, Ms. King and her daughter alleged impropriety by the
     ALJ.  They claimed that at the hearing ALJ Price told them that Ms. King was "not employable."
     Ms. King was therefore "very disappointed and angry that a judge could say one thing in court and

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V. DISCUSSION

Ms. King challenges the ALJ's decision on five grounds: (a) the ALJ's determination was not supported by substantial evidence; (b) the ALJ did not give controlling weight to the treating physicians' opinions; (c) ALJ did not properly assess Ms. King's alleged mental impairments; (d) the ALJ did not give due weight to testimony regarding pain and other ephemeral limitations; and (e) the ALJ erred in creating the work limitations.

**A. <u>Was the ALJ's Determination Supported by Substantial Evidence?</u>**

Ms. King asserts that the ALJ's determination was without substantial evidence. "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

Ms. King argues that the ALJ decision was without support because the RFC report generated by Dr. Sheehy could not be treated as an opinion from an acceptable medical source. Ms. King's primary argument in this regard is that the RFC determination did not contain a "wet" (holographic or handwritten) signature. Nonetheless, under Social Security Administration policy in effect in August 2008 electronic signatures from DDS disability examiners and medical examiners were acceptable. *See* Program Operations Manual System (POMS) DI 81030.100 (effective April 22, 2008), and in any event, electronic signatures on these specific documents became effective no later than June 8, 2009. Thus the court finds no indicia of unreliability related to the fact of an electronic signature.

---

then completely reverse his decision." (AR 194). Ms. King ordered the tape of the hearing (AR 203) and when the alleged statement was not on the tape, she asserted that the ALJ had "somehow removed that statement from the tape." Ms. King and her daughter wrote several letters on this issue which appear in the file, (AR 194, 196, 198, 200, 207). Ms. King's former counsel, Ian Sammis, raised this issue before the appeals counsel (AR 205). Ms. King and her daughter then asserted that Ms. King's continued denial of benefits was retaliation for her having complained about the ALJ. (AR 194, 207). Current counsel for Ms. King has not raised the alleged impropriety in this appeal.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Moreover, Ms. King seems to have misconstrued the second assessment from Dr. Dipsia.

2    Counsel for Ms. King argues that  "the record is silent" as to who the "phantom person" "AGD"

3    who concurs in the assessed limitations is.  However it seems clear to the court that "AGD" is

4    "Antoine G. Dipsia" and therefore this would not be a basis for finding that the assessment is

5    unreliable as Ms. King contends.  Therefore, the court does not find Ms. King's arguments regarding

6    lack of substantial evidence to be availing.

7    **B.  Did the ALJ Give Controlling Weight to the Treating Physicians's Opinions?**

8        Ms. King's argument in this regard is not completely clear.  She asserts first that the ALJ opinion

9    is flawed because there is no indication he considered any of the factors set out in 20 C.F.R.

10   §§ 404.1527 and 416.927 and SSR 96-2p.  20 C.F.R. §§ 404.1527(d) and 416.927((d) provide that

11   all of the following factors must be considered in deciding the weight given to any medical opinion:

12   (1) examining relationship; (2) treatment relationship (including the length of the relationship and

13   frequency of examination, nature and extent of the relationship); (3) supportability; (4) consistency;

14   (5) specialization; and (6) other factors that tend to support or contradict the opinion.  ALJ Price's

15   findings do not in any way disparage or discredit the opinions of any of Ms. King's treating

16   physicians, so the CFR sections she cites in this regard are unavailing.

17       Ms. King further alleges that it was error for the ALJ not to have made any findings regarding a

18   number of specific items found in Ms. King's medical reports.  These are: (1) Dr. Schaaf's opinion

19   of Ms. King "walking funny" (AR 254); (2) Dr. Schaaf's opinion that Ms. King "can't sit because

20   feet hurt + can't stand for more than 1-2 hours" (AR 287); (3) Dr. Schten's opinion of Ms. King

21   being "distraught" (AR 289):  and (4) Dr. Katz's opinion that Ms. King suffered from a previously

22   undiagnosed S1 radiculopathy (AR 294-297).

23       The Commissioner counters that the physicians' opinions are not in conflict with the ALJ's

24   findings, and moreover, the specifics raised by Ms. King are not medical findings as to her

25   limitations, but rather are only observations by the physicians or the recording of subjective reports

26   by her and so do not affect the appropriateness of the ALJ's findings.  As to the four specific issues

27   raised by Ms. King, the government responds as follows.

28

ORDER (C11-01380 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    As to the alleged omission of Dr. Katz's opinion, the government notes that the ALJ did make a

2  finding that Ms. King suffers an S1 radiculopathy.  (AR 18).

3    As to the report in Dr. Schaaf's notes that Ms. King is "walking funny" or Dr. Schten's

4  observation that Ms. King was "distraught," observations of a claimant's behavior or recitation of

5  subjective complaints of pain do not constitute a medical opinion.  *See* 42 U.S.C. § 423(d)(5)(A)

6  ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of

7  disability"); 20 C.F.R. § 404.1513(b); 20 C.F.R. § 404.1529(a) ("statements about your pain or other

8  symptoms will not alone establish that you are disabled").

9    The facts in this regard are similar to the case of *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir.

10  2005).  In *Ukolov*, the plaintiff Ukolov filed an applications for disability insurance benefits

11  asserting inability to work due to the following: multiple sclerosis; fibromyalgia; kidney stones;

12  fatigue; and numbness and cramps in his legs and arms.  Ukolov asserted that, among other things,

13  these impairments caused severe limitations in his hands and also frequent falls.  In evaluating the

14  severity of these asserted impairments, the ALJ considered the opinions of various treating and

15  examining medical professionals, including Dr. Gajanan Nilaver, a neurologist.  Dr. Nilaver reported

16  Ukolov's subjective complaints, including "gait ataxia," balance problems, dizziness, "limitations

17  with regards to sustained ambulation," and "increased tendency to fall."  Ukolov asserted that the

18  ALJ erred in not addressing Dr. Nilaver's statement regarding Ukolov's gait and imbalance

19  difficulties.  The Ninth Circuit held that those portions of the records did not support a finding of

20  impairment because they were based solely on Ukolov's own "perception or description" of his

21  problems.  *Id.*  at 1004-05 (citing 20 C.F.R. §§ 404.1528(a)-(b), 416.928(a)-(b)); *see also Batson v.*

22  *Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ properly discounted two treating

23  doctors' opinions in part because they were based on the claimant's subjective descriptions of pain).

24    Similarly, here the treating physicians' notes containing information shared by Ms. King, or even

25  recording the physician's own observation that on a particular day Ms. King was "distraught" or

26  "walking funny," are not the types of objective medical evidence required for a determination of

27  disability.  *Ukolov*, 420 F.3d at 1005.  Nor do these observations explain how Ms. King's capacity to

28  work has been affected.

ORDER (C11-01380 LB)

19

UNITED STATES DISTRICT COURT
For the Northern District of California

1   As to Dr. Schaaf's notation that Ms. King "can't sit because feet hurt + can't stand for more than

2   1-2 hours," this is similarly based on her subjective complaints and not on any medical testing.  In

3   terms of the statement that Ms. King cannot sit, her testimony at the hearing was that she spent a

4   large portion of the day sitting, thereby contradicting this one statement which does not appear

5   elsewhere in Dr. Schaaf's many medical reports.  It appears this anomalous notation that Ms. King

6   cannot sit was made to Dr. Schaaf at this time because Ms. King was seeking a note from Dr. Schaaf

7   to excuse her from jury service.  In any event, this notation is not a valid basis for the granting of

8   benefits in general.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1513(b), 20 C.F.R.   §

9   404.1529(a); *Batson*, 359 F.3d at 1195.  Moreover, in any event, the stated limitation on standing is

10   consistent with the ALJ's determination.

11   **C.  Did the ALJ Properly Assess Ms. King's Alleged Mental Impairments?**

12   Ms. King appeared before the ALJ on September 4, 2009, and he issued his findings on January

13   28, 2010.  The ALJ made no findings in regards to any effect of Ms. King's alleged depression on

14   her claim of disability.

15   Ms. King asserts that she suffers from uncontrolled depression which was "not diagnosed until

16   November 3, 2008" and which diagnosis "was confirmed April 14, 2010."  Despite the fact that Ms.

17   King acknowledges that this diagnosis was not "confirmed" until after the issuance of the ALJ

18   opinion, she alleges that it was error on the part of the ALJ: (1) to have relied on the two SSA

19   examiner's findings which predated the onset of Ms. King's depression; and (2) to have failed to

20   develop a record about Ms. King's depression which she states was "unambiguous."

21   In making his determination that Ms. King had residual functional capacity to perform certain

22   work, the ALJ relied in part on the assessments of two SSA examiners.  She alleges that it was error

23   for the ALJ to have relied on these assessments as they pre-dated the onset of her depression.

24   It is Ms. King's burden to show that she has a medically determinable mental impairment.

25   *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) ("The claimant first must bear the burden . . . at step

26   two that he has a medically severe impairment or combination of impairments.").  At the outset the

27   court notes that at the hearing Ms. King consistently stated that the basis for her disability claim was

28

ORDER (C11-01380 LB)

her legs and her feet.[10]  On at least two occasions during the hearing, the ALJ offered Ms. King the opportunity to raise any other issues she wished to, and he told her that this was her chance to flesh out the record.  At no point did either Ms. King or her daughter mention to the ALJ that depression was a basis for her claim.  She alleges that nonetheless, the ALJ had a duty to examine this issue as she states that the record demonstrates that she suffers from a colorable mental impairment including suicidal ideation (AR 101), depression (AR 171, 175, 182, 185)  and anxiety (AR 161).

Ms. King's allegation regarding suicidal ideation is misleading.  Her reference to the transcript in this regard (AR 101) is to her statement in her December 16, 2008 Request for Hearing in which she states "my daily life like that has changed to the point where it just isn't worth living," but she ignores that on September 22, 2008, Dr. Schaaf found her "negative for suicidality," and that while Ms. King continued to be treated by Dr. Schaaf and others there is no mention of treatment or follow-up for her depression in any of the physician's notes.[11]

Similarly, Ms. King alleges that on November 3, 2008, she was found distraught over her medical issues (AR 289).  While the record does indicate concern with her medical condition, the doctor's notes state that she "is very distraught, she has been turned [down] for disability."  This is consistent with Dr. Schaaf's medical records that indicate that Ms. King first began to complain of depression only after having been denied disability benefits.  (AR 239).

Ms. King's references to evidence of depression and anxiety in the record (AR 161, 171, 175, 182, 185) are all to Ms. King's self-reporting in Disability Appeal forms that she is becoming very depressed.  Again, the Ninth Circuit has found that a plaintiff can establish an impairment only "if the record includes signs -- the results of 'medically acceptable clinical diagnostic techniques,' such as tests --as well as symptoms" supporting the existence of that impairment. *Ukolov*, 420 F.3d at 1005.

---

[10]  Ms. King stated up through the ALJ hearing, she stopped working "because I was having a terrible time with my legs and my feet" (AR 43, 95, 101, 147, 171, 181, 191).

[11] Ms. King again self-reports that she had been prescribed pills for depression but that they did not work but there are no physician's records in evidence on this point although the ALJ held the record open for inclusion of any missing items.  (AR 182).

ORDER (C11-01380 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

The Ninth Circuit case of *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) compels the conclusion that the ALJ did not err by failing to develop the record further on the issue of Ms. King's depression.  It further compels the conclusion that remand to do so now is not appropriate. Mayes initially applied for disability benefits listing "Spinal Problems" as her disability.  Mayes was found disabled but on the basis of severe alcoholism and depression.  Years later, after a change in the law regarding alcoholism, the SSA reviewed Mayes's disability determination.  In conjunction with that review, Mayes told the Social Security Administration that her disabling conditions were "rheumatoid arthritis (spine, hips, knees, ankles are worst)," a cancer known as Bowens' disease, "lung problems," and a "hormone imbalance." *Id*. at 457.

At her ALJ hearing, Mayes testified that her most serious problem was her rheumatoid arthritis. She also testified that she was able to do so shopping and cleaning and could care for herself.  After the ALJ determined that Mayes was not eligible for disability insurance benefits.  Mayes submitted information from her orthopedist, that she had a herniated disc.  The district court nonetheless affirmed the ALJ's decision, and Mayes appealed.

On appeal the Ninth Circuit held that although Mayes's past medical history indicated that she had had some back problems, and Mayes testified at the hearing that her back hurt, because Mayes did not provide the ALJ with any medical evidence indicating that she had herniated discs until after the ALJ Hearing, the ALJ had no duty to develop the record by diagnosing Mayes's herniated discs. *Id*. at 459-60.

The Ninth Circuit further found no basis for remand.  The Court held that even assuming that Mayes's back problems were in dispute at the ALJ Hearing and that she met the requirement of demonstrating that the evidence of her herniated disc was material, Mayes failed to show good cause for not having offered the evidence in issue earlier: "A claimant does not meet the good cause requirement by merely obtaining a more favorable report once his or her claim has been denied.  To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier." *Id*. at 462.

For Ms. King, the only "medical evidence" in the record in regards to a diagnosis of depression is Dr. Schaaf's April 14, 2010 letter stating that Ms. King "is currently undergoing treatment for

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Hypertension, uncontrolled depression, + for obesity, + for glucose."  This evidence is problematic

2  in several ways.  The evidence must relate "to the period on or before the date of the ALJ decision."

3  20 C.F.R. § 404.976(b)(1). While Ms. King alleges this letter "confirms" that she was diagnosed

4  with depression on August 6, 2008, the letter does not in fact state whether she was undergoing

5  treatment for depression on or prior to the date of the letter, and as discussed above, the medical

6  records do not support any prior actual physician diagnosis in this regard.

7      Additionally, Dr. Schaaf's letter is new evidence introduced only during the appeal process.

8  As discussed above, this new evidence can only be considered if it is material and there was good

9  cause for the failure to incorporate the evidence into the record at the initial proceeding.  Ms. King

10  has provided no reason why she could not have submitted medical evidence demonstrating that she

11  suffered a diagnosis of depression and its alleged severity prior to the ALJ hearing as required by 20

12  CFR § 404.1512(a).

13      Ms. King's citation to the cases of  *Stambaugh v. Sullivan*, 929 F.2d 292, 296 (7th Cir. 1991),

14  and *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991)(per curiam) are unavailing.  Unlike the

15  *Mayes* opinion, neither is binding precedent.  Moreover, *Stambaugh* is no longer good law as it has

16  been superseded by new Regulations, as stated in *Burke v. Astrue*, 7th Cir.(Ill.), January 15, 2009.

17      In conclusion, Ms. King has failed to demonstrate that the ALJ erred by failing to enlarge the

18  record based on her mental state.  Nor is remand to do so required.

19  **D.  Did the ALJ Give Due Weight to Testimony Regarding Pain and Other Ephemeral**
    **Limitations?**

20

21      Ms. King mostly reiterates her argument above that Dr. Schaaf's letter of April 2010 compels

22  remand of the matter for a determination of her mental impairment and as such is not availing.  She

23  also seems to allege that the ALJ erred by making a determination of her credibility, but she does not

24  specify the areas.

25      To determine whether a clamant's testimony about subjective pain or symptoms is credible, the

26  ALJ must engage in a two-step analysis.  *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)

27  (*citing Lingenfleter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).   First, the ALJ must

28  determine whether the claimant has presented objective medical evidence of an underlying

UNITED STATES DISTRICT COURT
For the Northern District of California

1   impairment that reasonably could be expected to produce the alleged pain or other symptoms. *See*

2   *Lingenfelter*, 504 F.3d at 1036. Second, if the claimant meets the first test and there is no evidence

3   of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms by

4   offering specific, clear and convincing reasons for doing so. *Morgan v. Comm'r of Soc. Sec. Admin*,

5   169 F.3d 595, 599 (9th Cir. 1999). This court defers to the ALJ's credibility determination if it is

6   supported by substantial evidence in the record. *See Thomas*, 278 F.3d at 959 (9th Cir. 2002).

7       The ALJ made certain findings on the record where he found a discrepancy between the medical

8   evidence and Ms. King's claim that the intensity and limiting effects of her symptoms made her

9   disabled. The ALJ first noted Ms. King's testimony at the hearing that she could drive

10  independently, walk in her home, care for herself, and make jewelry and that she did not have pain

11  in her feet, although she felt unsteady. The ALJ found that to the extent her testimony was not

12  consistent with the findings of residual functional capacity, he could not credit her testimony.

13      Specifically, the ALJ found Ms. King not credible, balancing her testimony about her abilities to

14  care for herself against the following: her infrequent doctor visits in 2009 despite testimony that her

15  pain had worsened; the fact that she declined to use an assistive devise despite reported imbalance

16  and fear of falling; and the conservative treatment for her pain which included only the use of

17  Motrin. (AR 19-20). The ALJ's credibility findings are supported by the record as noted above and

18  by Ninth Circuit case law. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (lack of

19  consistent medical treatment "powerful evidence" that plaintiff's claims of severe pain, depression,

20  and fatigue were not credible); *Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001) (claimant

21  not credible where he "has not participated in any significant pain regimen or therapy program"); *see*

22  *also Thomas v. Barnhart*, 278 F.3d 948, 958-59 (9th Cir. 2002) (claimant's ability to perform

23  household chores suggests the ability to perform a reduced range of light work).

24      Because the ALJ's credibility determination is supported by substantial evidence in the record,

25  the court defers to that determination.

26  **E. Did the ALJ Err in Creating the Work Limitations?**

27      Ms. King argues she should be found incapable of greater than sedentary work and thus found

28  *per se* disabled. For support she refers to the sedentary "grid" rule 201.14 under 20 C.F.R. Part 404,

ORDER (C11-01380 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Subpart P, Appendix 2.  However, application of this rule is not appropriate in Ms. King's case as

2   she was found capable of performing past work.  *See* 20 C.F.R. § 404.1569 ("We apply these rules in

3   cases where a person is not doing substantial gainful activity and is prevented by a severe medically

4   determinable impairment from doing vocationally relevant past work.") (emphasis added).  Even if

5   the grids did apply, sedentary "grid" rule 201.14 would not apply because the ALJ found Ms. King

6   capable of a limited amount of light work.

7                                          **VI. CONCLUSION**

8        The court **DENIES** Ms. King's motion for summary judgment and **GRANTS** the

9   Commissioner's cross-motion for summary judgement.

10       This disposes of ECF Nos. 23 & 24.

11       **IT IS SO ORDERED.**

12   Dated: March 14, 2013                    _____

13                                            LAUREL BEELER
                                             United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER (C11-01380 LB)                              25